## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 24 2019, 8:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

J.M. and E.M. (Minor Children),

and

J.K. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

May 24, 2019

Court of Appeals Case No.
18A-JT-2868

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1804-JT-467, 49D09-1804-JT-468

and

Child Advocates, Inc.,
*Guardian Ad Litem.*

**Altice, Judge.**

## Case Summary

J.K. (Mother) appeals the termination of her parental rights to two of her minor children, J.M. and E.M. (collectively, the Children). She contends that the trial court's termination order is not supported by sufficient evidence.

We affirm.

## Facts & Procedural History

Mother gave birth to J.M. and E.M. in November 2009 and April 2011, respectively. Due to alcohol abuse, she was unable to provide the Children with a safe, stable home. Accordingly, at some point, the Indiana Department of Child Services (DCS) became involved with the family and offered services, but Mother continued to struggle with alcohol abuse. DSC removed the Children from Mother's care on March 2, 2016 and placed them with Mother's

mother and step-father (collectively, Maternal Grandparents). DCS filed a petition alleging the Children to be children in need of services (CHINS).

[4]     At a hearing on April 15, 2016, Mother admitted the Children were CHINS.[1] Her specific admission was as follows: "Mother needs assistance in maintaining her sobriety, therefore the Court intervention is needed for the [C]hildren's well-being." *Exhibits* at 44-45. The trial court accepted Mother's admission and adjudicated the Children as CHINS. The parties then agreed to proceed with disposition that same day. The parental participation order directed Mother to engage in a homebased therapy program recommended by her DCS family case manager (FCM), submit to random drug/alcohol screens, and participate in Celebrate Recovery.

[5]     Mother initially complied with services and actively worked toward maintaining her sobriety. It was apparent to service providers that she loved the Children and understood that her alcohol abuse was the barrier to being able to parent them. The Children also made progress during this time with Mother exercising regular supervised visits. By the end of 2016, Mother had some difficulty with services but came back into compliance in the spring of 2017. She had clean drug/alcohol screens in April and May and was permitted unsupervised visits with the Children by early June. On July 25, 2017, the

---

[1] The Children's father never appeared in the CHINS proceedings and was defaulted in June 2016. The record suggests that he passed away in October 2017. Regardless, his parental rights to the Children were terminated in November 2018.

Children began a temporary trial visit (TTV) with Mother in her home. Mother was about six months pregnant at the time.

[6] During the TTV, around 11:00 p.m. on September 5, 2017, police were dispatched to Mother's home. IMPD Officer Richard Weaver responded and found the Children and a neighbor outside. Mother was not home. About twenty-five minutes later, Officer Weaver observed Mother stumbling down the middle of the street carrying a large bottle of vodka that was nearly empty. She was angry and cursing as she approached. Officer Weaver noted that her speech was slurred and she smelled of alcohol. At some point, in the presence of the Children, Mother threatened to burn down the neighbor's house.

[7] Officer Weaver followed Mother inside her home where the Children were with another officer. Mother was belligerent, and the Children appeared very upset by her behavior. She directed her anger to the Children and told them that the police were there to take them away and that she would never see them again. At one point, she yelled in front of the Children that she did not want them anymore and that she wanted to go smoke crack. She pushed and kicked the Children away as they tried to climb onto her lap. When Mother proceeded to drink the rest of the vodka, Officer Weaver arrested her.

[8] Officer Weaver took Mother in handcuffs onto the front porch while they waited for a transport for Mother, as well as DCS. Mother continued to curse and make threats. She then stood up, pulled down her pants, and urinated on the porch, as DCS assessment worker Alexis Beane arrived. Beane went inside

the home and found it in "deplorable conditions." *Transcript* at 51. The Children were sitting with the vodka bottle between them, the home was cluttered, there was no running water, and Mother's vomit was all over the bed and floor in the Children's bedroom.

[9] On September 6, 2017, the State charged Mother in Marion County with two counts of Level 6 felony neglect of a dependent, one count of Level 6 felony intimidation, and one count of Class B misdemeanor public intoxication (the Criminal Neglect Case). Beane spoke with her in jail several days later. Mother indicated that she did not remember Beane from the night of the arrest. She told Beane that she wanted to give up the Children because she was unable to be a good mom. After the failed TTV, the Children "regressed and it was really hard to bring them back", according to their homebased therapist Felix McGee. *Id.* at 26.

[10] At the CHINS review hearing on September 22, 2017, Mother admitted that she had relapsed. She claimed that she was actively working toward sobriety again. Homebased therapist Kat O'Hara worked with Mother between October and December 2017. Mother proved unable to stay sober during this time and eventually ceased contact with O'Hara. Mother gave birth to her youngest child in November 2017. A CHINS case was opened with respect to the baby but was later closed because the baby was in his father's full custody.

[11] On December 10, 2017, Mother was arrested in Boone County and charged the following day with six alcohol and drug-related misdemeanor offenses,

including operating while intoxicated (OWI) and possession of marijuana (the Boone County OWI Case). Mother bonded out of the Boone County Jail on January 18, 2018.

[12] In the meantime, on January 16, 2018, Mother pled guilty in the Criminal Neglect Case, pursuant to a plea agreement, to one count of Level 6 felony neglect of a dependent and one count of Level 6 felony intimidation. The court sentenced her to 545 days with 525 days (all but time served) suspended to probation.

[13] On January 24, 2018, Indiana State Trooper Joseph Malone responded to a property-damage crash and found Mother in her vehicle on an exit ramp in Marion County. She was "very incoherent" with "wide and bloodshot" eyes. *Id.* at 6. Mother failed two out of three field sobriety tests. Mother admitted to having taken two Percocet pills. Additionally, Trooper Malone observed inside the vehicle "a half rolled cigarette with plant material in side [sic], a clear bag with plant material inside and then tin foil with plant material inside." *Id*. at 7. Mother was arrested and later charged with Class A misdemeanor OWI, Class A misdemeanor possession of a synthetic drug or lookalike substance, Class B misdemeanor leaving the scene of an accident, and Class A infraction driving while suspended (the Marion County OWI Case).

[14] On February 28, 2018, Mother's probation in the Criminal Neglect Case was revoked, and she was ordered to serve 180 days in jail. Further, on April 13, 2018, Mother entered into a plea agreement in the Marion County OWI Case,

pursuant to which she pled guilty to one count, Class A misdemeanor OWI. The court sentenced her to 365 days in jail with 275 days suspended.

[15] On July 30, 2018, Mother entered into a plea agreement in the Boone County OWI Case. She pled guilty to one count, Class A misdemeanor OWI, and the other five counts were dismissed. The court sentenced her to 365 days in jail with all but time served suspended to probation.

[16] In the midst of Mother's criminal cases, the court in the CHINS matter changed the plan from reunification to termination of parental rights on March 23, 2018. Thereafter, on April 11, 2018, DCS filed the instant petitions to involuntarily terminate the parent-child relationship between Mother and the Children.

[17] Mother was incarcerated between February and August 2018. Upon her release, she contacted DCS caseworker India Medaris to restart supervised visits. Mother had a visit or two with the Children but none after August 25.

[18] At the time, Mother lived in what Medaris described as "an abandoned home" with "windows busted out" and a front door that did not lock. *Id*. at 57-58. The home was cluttered, infested with fleas and flies, and inhabited by a family of racoons. Medaris noted that each time she visited, there was a male present in the home. Mother told her that the men kept coming in without permission and often wanted sexual contact. Medaris attempted to work with Mother to get her out of these unsafe living conditions, but Mother did not want to leave the home and refused to work with Volunteers of America regarding housing and employment.

[19]     Medaris last met with Mother at the end of September with Mother having made no progress.[2] At that meeting, Mother indicated that she "gave up" and did not want to see the Children, who at this point lived in Evansville with Maternal Grandparents. *Id.* at 59. Medaris stated that she was willing to drive Mother to Evansville for visits, but Mother refused. FCM Henry Fahnbulleh, who was also present at the late-September meeting, observed that Mother "definitely [] was not in very good shape." *Id.* at 66. She steadfastly rejected services.

[20]     Mother did not appear for or present any evidence at the final termination hearing on October 24, 2018, but she was represented by counsel. The hearing was held in her absence. In addition to the evidence set forth above, several witnesses opined that termination of the parent-child relationship was in the Children's best interests. Specifically, McGee, the Children's therapist for over two years, recommended adoption because they needed stability that Mother had been unable to provide. McGee also expressed confidence that the Children's needs were being taken care of by Maternal Grandparents.

[21]     FCM Fahnbulleh testified that he believed adoption by Maternal Grandparents was in the Children's best interests. He explained that Maternal Grandparents have provided "a safe haven" for them and that Mother "has not demonstrated the ability to provide adequately for these children". *Id.* at 68. FCM

---

[2] Mother did not show up for this team meeting, so the service providers went to her home and found her there. They all sat on the front porch, as Mother would not permit them inside.

Fahnbulleh noted that the goal is permanency and stability for the Children and that the CHINS case had been pending for a significant period of time.

[22] Similarly, the Guardian ad Litem (the GAL) opined that termination was in the Children's best interests. She indicated that the Children are happy, content, and well-bonded with Maternal Grandparents. The GAL explained, on the other hand, with respect to Mother:

> Every time [Mother] had a period where she was doing very well, the children were progressing and they went to TTV, but every time there was a step back. Even before we went to supervise, you know, and we would talk about the unsupervised and something would happen. The children, especially [J.M.] was greatly impacted. His trust for mom already was shaky. So, every time something would happen, we'd have to go back and tell him there was a change and we're not going to move forward. It just would shatter him. [E.M.], he was more sad. [J.M.] was disappointed and angry a lot of times. So, I think the impact of going back and forth with the services with mom was hard therapeutically on the children.

*Id.* at 85-86. The GAL testified that giving Mother more time, after already so much time, would not be beneficial to the Children because therapeutically, physically, and mentally they needed to be in a stable, loving, permanent home.

[23] On October 26, 2018, the trial court entered an order terminating the parent-child relationship between Mother and the Children. Mother now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[24] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[25] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[26] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[27] On appeal, Mother asserts that there is insufficient clear and convincing evidence that the conditions resulting in the Children's removal would not be remedied, that the continuation of the parent-child relationship poses a threat to their well-being, and that termination is in the best interests of the Children. We will address each of these in turn, as needed.

[28]     Mother first contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied. In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.* The court may consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[29]     Here, the trial court concluded with respect to I.C. § 31-35-2-4(b)(2)(B)(i):

> There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their mother. The underlying CHINS cases have been pending for over two and one-half years. Services have been offered and referred to address conditions of sobriety and appropriate housing. The children's therapist described [DCS's] efforts for [Mother] has [sic] "bending over backwards". At the time of trial in this matter, [Mother] had not demonstrated the ability to remain sober or provide safe and appropriate housing.

*Appendix* at 88.

[30] Mother directs us to evidence of the progress she made shortly after the Children's removal and prior to the TTV in July 2017. Indeed, Mother complied with services, responded to therapy, and stayed sober in the months leading up to the TTV. Shortly after the TTV started, however, Mother began abusing alcohol again, despite being pregnant, and was arrested late at night on September 5, 2017 for criminal neglect, public intoxication, and intimidation. Mother's drunken and belligerent behavior in front of and often directed toward the Children that night speaks volumes. Officer Weaver described Mother's interaction with and affect upon the Children as being "as bad as it gets." *Transcript* at 18. The events of this night had a particularly damaging and lasting effect on J.M., who was nearly eight years old at the time.

[31] After this arrest, Mother engaged in services for a few months with homebased therapist O'Hara. She was open with O'Hara regarding her alcohol addiction, but Mother remained unable to maintain sobriety. Mother was arrested in December 2017 for, among other things, OWI and then again in January 2018. Her three separate criminal convictions, as well as a violation of probation, led to Mother being incarcerated from February to August 2018.

[32] Upon her release from incarceration, Mother contacted DCS caseworker Medaris, and Medaris and other service providers attempted to re-engage Mother in services. In late September 2018, however, Mother refused offered services and indicated her desire to give up. At the time, Mother was living in

an unsafe, inappropriate home that was infested with bugs and occupied by a family of racoons. The home was unsecure and Mother had men coming and going who wanted to take advantage of her sexually and otherwise. Despite these deplorable circumstances, Mother rejected services aimed at helping her find suitable housing and employment.

[33] Consistent with Mother's expressed desire to no longer pursue reunification, she did not appear at the final termination hearing on October 24, 2018. At the hearing, DCS presented overwhelming evidence that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside Mother's home will not be remedied. The trial court's ultimate determination in this regard is supported by clear and convincing evidence. Therefore, as I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not review the trial court's determination that continuation of the parent-child relationship would pose a threat to the Children's well-being.

[34] Mother also asserts that the evidence was insufficient to support the trial court's finding that termination was in the Children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central

consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[35] At the time of the termination hearing, Mother was in no condition to care for the Children, as she could barely care for herself. The CHINS proceedings had been ongoing for two and one-half years, and in the year leading up to the termination hearing, Mother had serious struggles with addiction. This resulted in three criminal convictions in 2018 and six months of incarceration. Shortly after her release from incarceration, Mother rejected housing and other assistance offered by services providers and chose to give up on reunification with the Children and remain living in an uninhabitable house.

[36] Under these circumstances, the FCM and the GAL, as well as others, opined that termination of parental rights was in the best interests of the Children, who were thriving in the care of Maternal Grandparents and who deserved permanency after so long. The trial court's determination that termination of the parent-child relationship was in the best interests of the Children is amply supported by the evidence and not clearly erroneous.

[37] Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.